UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SARAH SENCHYSHYN,

                            Plaintiff,

        -against-                             6:17-CV-0162 (LEK/TWD)

BIC SPORT NORTH AMERICA, INC.,

                            Defendant.

---

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff Sarah Senchyshyn brings this products liability action seeking compensation for injuries allegedly caused by a paddleboard she bought from defendant BIC Sport North America. Dkt. No. 1 ("Complaint").

Presently before the Court is Defendant's motion for summary judgment seeking dismissal of the Complaint in its entirety. Dkt. Nos. 53 ("Summary Judgment Motion"); 55-18 ("Statement of Material Facts" or "SMF"); 55-19 ("Memorandum"). Plaintiff opposes the motion. Dkt. Nos. 60 ("Response to SMF"); 60-1 ("Statement of Disputed Facts" or "SDF"); 61 ("Plaintiff Affidavit"); 61-1 ("Rao Affidavit"); 62 ("Opposition"). Defendant has filed a reply. Dkt. No. 65 ("Reply"). For the following reasons, the Court grants Defendant's Summary Judgment Motion in part and denies the motion in part.

## II.    BACKGROUND

This action arises out of Plaintiff's purchase and use of a paddleboard ("Board") manufactured by BIC Sport SASU, a non-party. SMF ¶ 1.[1] Plaintiff, a New York resident, purchased the Board from Defendant in June 2016. SMF ¶ 7; Compl. ¶ 3. Defendant is a direct subsidiary of BIC Sport SASU and is the sole distributor of BIC Sport SASU's products in the United States. SMF ¶ 2. Defendant is incorporated in and has its principal place of business in Massachusetts. Id. ¶ 3.

The Board consisted of a polystyrene core layered with fiberglass and resin, a fiberglass wrap, and a plastic skin. Id. ¶ 13. It was finished manually by a technician who visually inspected the Board and smoothed the seam with power tools. Id. ¶ 17.

Plaintiff used the Board for paddleboarding two to three times per day during the weeks after she purchased it. Id. ¶¶ 23–24. She would secure the Board to the roof of her car and remove it from the car by hand. Id. ¶ 25. About two weeks after beginning to use the Board, Plaintiff started feeling pain in both hands. Pl. Dep. at 138. At the time, she could not determine the cause of the pain and continued her paddleboarding routine. Pl. Aff. ¶¶ 18–19. Three weeks into use, Plaintiff started to see some things "almost like a cactus" protruding from her fingers and would remove the protrusions with tweezers. Pl. Dep. at 144–45.

Due to the persistent pain, Plaintiff went to the emergency room on August 17, 2016 and reported two ulcers on her left hand at the base of her thumb and on her index finger. SMF ¶ 33.

---

[1]  Where the Court cites only to the SMF, those facts were undisputed by Plaintiff. In the course of this opinion, the Court also relies on the following materials: Dkt. Nos. 53-4 ("Interrogatories"); 53-5 ("Plaintiff Deposition"); 53-7 ("Griger Deposition"); 53-8 ("DeCerbo Deposition"); 53-10 ("Russin Deposition"); 54-1 ("Griger Record"); 54-2 ("Russin Record"); 54-4 ("Rao Deposition"); 54-5 ("Rao Report, Part 1"); 54-6 ("Rao Report, Part 2"); 55-3 ("Reitman Report"); 55-4 ("Camerota Report"); 55-9 ("Farah Report").

A healthcare worker suggested that she might have broken glass embedded in her hands, and Plaintiff agreed that it was possible. Pl. Aff. ¶ 20. An x-ray revealed no presence of foreign bodies. Id. ¶ 21. Plaintiff was then referred to the plastic surgery department and advised to wear gloves to protect her hands. Id. Several days later, Plaintiff visited a physician's assistant, who conducted an excision procedure to remove the skin on Plaintiff's left thumb and index finger. Id. ¶¶ 37, 40. But a biopsy of the excised skin did not reveal any foreign objects. Id. ¶ 40; Pl. Aff. ¶ 22.

Around this time, Plaintiff's sister Aleah Homer observed "very small translucent whitish fibers sticking out of" Plaintiff's fingers. Pl. Aff. ¶ 23. Plaintiff later determined that the Board was the source after observing "loose fibers" protruding from the seam. Id. ¶ 24. At a subsequent appointment on August 30, Plaintiff told the physician's assistant of her discovery and was advised to stop using the Board. Id. ¶ 25; SMF ¶¶ 41–42. Plaintiff complied, but the pain got worse, and more fibers began working their way out of her hands. Pl. Aff. ¶ 26. About one week later, on September 9, Plaintiff reported two new ulcers on the right hand to her physician. SMF ¶ 43. At her next appointment, on September 27, Plaintiff reported that her hands were much better, but she still felt there was fiberglass in her fingers. Id. ¶¶ 45–48. Her physician advised that further excision was not recommended because the fiberglass would typically work itself out of her hands. Id. ¶ 46. In November, Plaintiff reported to her physician that she continued to have pieces of fiberglass coming out of her hands, despite not having used the Board for months. Id. ¶ 47.

Plaintiff did not return for another hand treatment until six months later. Id. ¶ 48. In June 2017, she visited her physician again regarding ongoing problems with both hands, at which time she presented a jar of materials she had removed from her skin. Id. ¶¶ 49–50. Plaintiff's

physician described the materials as "almost amber colored flex [sic] of fiberglass at least a tablespoon's worth" and diagnosed Plaintiff at that visit with "questionable foreign objects, bilateral hands." Id. ¶ 50; Russin Record at 22. In August, believing she still had fiberglass in her hands over one year since she had last used the Board, Plaintiff specifically asked her physician to excise the skin on her hands. Id. ¶ 52. A biopsy of the excised skin sample again did not detect any foreign bodies. Id. ¶ 53.

Plaintiff filed this lawsuit in February 2017, asserting nine causes of action: (1) strict products liability – manufacturing defect, (2) strict products liability – design defect, (3) strict products liability – failure to warn, (4) breach of express warranty, (5) breach of implied warranty, (6) negligent manufacture, (7) negligent design, (8) general negligence, and (9) punitive damages. Compl. at 4–14. After extensive discovery, Defendant moved for summary judgment on all causes of action in September 2019. Summ. J. Mot.; see also Docket.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.'" Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 WL 4805354, at *8 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV.   DISCUSSION

### A.  Choice of Law

As an initial matter, the Court must determine the governing law in this diversity action Compl. ¶ 1. Defendant argues that New York law applies here. Mem. at 1. Plaintiff does not contest this assertion, see Opp'n, and, in any event, the Court agrees with Defendant.

"A federal court sitting in diversity . . . must apply the substantive law of the state in which it is sitting, including the state's choice of law rules." Young Men's Christian Ass'n of

Plattsburgh v. Philadelphia Indem. Ins. Co., No. 18-CV-565, 2018 WL 6267923, at *3

(N.D.N.Y. Nov. 30, 2018) (Kahn, J.) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)).

New York gives "controlling effect to the law of the jurisdiction which, because of its

relationship or contact with the occurrence or the parties, has the greatest concern with the

specific issue raised in the litigation." Nuss v. Sabad, 976 F. Supp. 2d 231, 241 (N.D.N.Y. 2013)

(Kahn, J.) (citing Babcock v. Jackson, 191 N.E.2d 279, 283–84 (N.Y. 1963)).

Here, Plaintiff is a resident of New York, purchased the Board in New York, and was

injured in New York. Compl. ¶ 3; SMF ¶¶ 5–7, 29–57. While Defendant is incorporated in and

has its principal place of business in Massachusetts, it does business in New York and is subject

to jurisdiction here. Mem. at 1. The Court therefore applies New York substantive law. See e.g.,

Colon v. Multi-Pak Corp., 477 F. Supp. 2d 620, 625–26 (S.D.N.Y. 2007) (applying New York

law where the plaintiff was a New York resident, the accident occurred in New York, the product

at issue was sold to the plaintiff's employer in New York, and the out-of-state defendant

manufacturer did business in New York).

**B.  The Merits of Defendant's Summary Judgment Motion**

To establish a prima facie case regarding any theory of products liability under New York

law, a plaintiff must show that "the product at issue was defective" and it was "the actual and

proximate cause of the plaintiff's injury." Lara v. Delta Int'l Mach. Corp., 174 F. Supp. 3d 719

(E.D.N.Y. 2016) (citing Voss v. Black & Decker Mfg. Co., 450 N.E.2d 204, 208–09 (N.Y.

1983)). Defendant moves for summary judgment as to all causes of action primarily on the

grounds that Plaintiff has failed to raise a genuinely disputed issue of fact as to (1) whether the

Board was defective and (2) whether the board was the cause of her injuries. See Mem. at 1.

Defendant also seeks to exclude the report of Plaintiff's materials expert, Arvind Rao. Id. at 13.

Since Plaintiff relies primarily on Rao's testimony to prove both that the board was defective and that it caused Plaintiff's injuries, the Court first addresses the admissibility of Rao's testimony before ruling on Defendant's arguments regarding defect and causation. See Cohalan v. Genie Indus., Inc., No. 10-CV-2415, 2013 WL 829150, at *2 (S.D.N.Y. Mar. 1, 2013) ("[A] court may—and sometimes must—decide questions regarding the admissibility of evidence, including expert opinion evidence, on a motion for summary judgment.").

### 1. Admissibility of Rao's Expert Report

Defendant objects to both the form and the substance of Rao's report. Mem. at 13; Reply at 2. With regard to the form, Defendant characterizes Rao's opinion as "speculation," given that "[n]owhere in [Rao's] expert reports did he offer his conclusions or opinions to a reasonable degree of certainty."[2] Mem. at 13. The Court finds this argument unavailing. An expert witness need not express their opinion "in term of the particular combination of magical words represented by the phrase 'reasonable degree of [] certainty,'" as long as it conveys "equivalent assurance that it was not based on either supposition or speculation." Ongley v. Mount Sinai Health Sys., Inc., No. 14-CV-3360, 2017 WL 5515856, at *3 (S.D.N.Y. Jan. 17, 2017) (citations omitted), aff'd sub nom. Ongley v. St. Lukes Roosevelt Hosp. Ctr., 725 F. App'x 44 (2d Cir. 2018). "Care must be taken . . . to see that the incantation does not become a semantic trap and the failure to voice it is not used as a basis for exclusion without analysis of the testimony itself."

---

[2] Defendant also highlights that Rao wrote in his report "the presence of loose fibers . . . *potentially* indicates that the board seam rail was not properly finished." Mem. at 13 (emphasis in original) (citing Rao Report, Part 2 at 5). But the Court notes that Rao omitted the word "potentially" in his affidavit in response, bolstering the certainty of his conclusion. See Rao Aff. ¶ 30; see also White v. ABCO Eng'g Corp., 221 F.3d 293, 305 (2d Cir. 2000) (considering affidavit that "merely clarified" the expert's earlier testimony when deciding a summary judgment motion).

Schulz v. Celotex Corp., 942 F.2d 204, 208 (3d Cir. 1991). Thus, to determine its admissibility, the Court must turn to the substance of Rao's report.

On the substance, Defendant notes that Rao chose to disregard the chemical analysis of one of the two fibers he tested.[3] Mem. at 11–12; Reply at 2; Rao Report, Part 2 at 38. The result of Rao's test of that fiber showed only carbon and oxygen, inconsistent with the composition of fiberglass.[4] See Reply at 2. Defendant further notes that only fibers that were perpendicular, rather than parallel to the Board's seam, could potentially become dislodged and impact Plaintiff's hands. Id. (citing Rao Dep. at 98, 117). And since Rao disregarded the only perpendicular fiber he tested, Defendant argues that Rao's report is not probative on whether the Board was defective for containing loose fiberglass in the seam. Id.

After reviewing Rao's deposition testimony, the Court finds that Defendant's reading runs counter to the record. While Defendant's counsel seemed to suggest otherwise, Rao clarified during the deposition that he was "not necessarily distinguishing the hand contact with

---

[3]  Rao explained that he excluded the result as unreliable because "the extremely disjointed, blurry and unclear image of the analyzed fiber [] prevented the detection of lower elemental counts from the fiber." Rao Aff. ¶ 31. Defendant appears to argue that the result is in fact reliable and, thus, undermines Rao's analysis, see Reply at 2 (suggesting that Rao's analysis conclusively "demonstrate[d] that the fiber in question was not fiberglass"), but points to nothing to counter Rao's description of the fiber's image or address his concerns about the result's reliability, see id. (failing to discuss or acknowledge Rao's concerns about the quality of the image of the fiber); Mem. at 11–12 (same). Under the circumstances, the Court is hard-pressed to find that Rao's whole report is inadmissible for excluding that test, particularly where Defendant does not question the reliability of the test Rao did include. Accordingly, to the extent Defendant believes Rao should have included the second test result in his report, that concern goes to the weight of Rao's report and does not bear on the admissibility of Rao's report or, more broadly, the merits of Defendant's Summary Judgement Motion. See e.g., Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying [the summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

[4]  "[A] fiber with a high proportion of silicon compared to carbon, along with elements such as oxygen, calcium and aluminum, often indicates glass, while a dominant carbon peak and notable oxygen peak . . . generally indicates a polymeric fiber such as polyester or cotton." Reitman Report at 6.

those two different types of fibers," maintaining that both perpendicular and horizontal fibers could become dislodged. Rao Dep. at 118. In fact, Rao testified that perpendicular fibers were just horizontal fibers "further loosened by repeated contact." Id.

Moreover, upon review of Rao's expert report, the Court does not find any "serious flaws in reasoning and methodology" that would warrant exclusion. See Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 43 (S.D.N.Y. 2016) (citations omitted) ("[E]xclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology."). In determining the nature of the fibers in question, Rao examined the samples through visual inspection, scanning electron microscopy ("SEM"), and energy dispersive x-ray spectroscopy ("EDS"). See Rao Aff. ¶ 21. Such methodologies are sufficiently reliable to admit Rao's report. See e.g., Romero by & through Ramos v. S. Schwab Co., Inc., No. 15-CV-815, 2017 WL 5885543, at *10 (S.D. Cal. Nov. 29, 2017) ("[SEM] is a test reasonably relied on by experts in the field of fiber identification."); Am. Med. Sys., Inc. v. Laser Peripherals, LLC, 712 F. Supp. 2d 885, 896 (D. Minn. 2010) (admitting expert testimony regarding optical fibers based on SEM-EDS results). In addition, the Court notes that Defendant's expert Maureen Reitman used the same methodologies in examining two fibers from the Board seam, though she opined differently that the morphology and chemical composition of the fibers were inconsistent with that of fiberglass. See Opp'n at 12; Reitman Report at 5–6. Despite Reitman's opposite conclusions and objections that Rao's analysis is flawed, Rao's analysis falls within "the range where experts might reasonably differ," and the jury, not the court, should be the one to "decide among the conflicting views of different experts." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999); see also Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993) ("Vigorous

cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

 Nor does the Court find analogous the cases cited by Defendant in support of their

argument that Rao's testimony should be excluded. For instance, in June v. Lift-A-Loft Equip.,

Inc., the court disregarded expert testimony "devoid of any factual basis" and consisting solely of

a statement that "it was possible . . . for two chain anchor bolts to [] break." No. 88-CV-1205,

1992 WL 168181, at *3 (N.D.N.Y. July 13, 1992), aff'd sub nom. June v. Lift-a-Loft Equip., 990

F.2d 623 (2d Cir. 1993). In contrast, Rao based his conclusion on sufficient facts and detailed his

analysis in the report. See generally Rao Report, Part 1; Rao Report, Part 2. He conducted

multiple visual inspections and measurements of the Board, compared its cross-sections to an

exemplar board, and examined fiber samples extracted from the Board and Plaintiff's hands. See

Rao Aff. ¶¶ 10–30. Thus, the remaining cases cited by Defendant—all of which excluded expert

testimony because the testimony did not rest on a sufficiently firm factual foundation—are just

as distinguishable as June. See Mem. at 13; Schwarz v. FedEx Kinko's Office, No. 08-CV-6486,

2009 WL 3459217, at *12 (S.D.N.Y. Oct. 27, 2009) (explaining that the expert "admits that he is

unable to speak to whether the actual mat, of which he had a sample, was worn" and "has no

personal knowledge of the mat's condition"); Lynch v. Trek Bicycle Corp., 374 F. App'x 204,

206 (2d Cir. 2010) (noting that the expert "repeatedly declined to offer any quantitative or

scientifically-based testimony regarding his theory of how both forks failed" and "without

performing any testing, [] testified to how the failure 'could have happened'"); Rabozzi v.

Bombardier, Inc., No. 03-CV-1397, 2007 WL 951569, at *6 (N.D.N.Y. Mar. 27, 2007)

(describing how the expert "failed to perform any tests or measurements" or "explain the

reasoning or calculations behind his opinions"). Therefore, the Court denies Defendant's request to exclude Rao's testimony.

### 2. *Whether the Board Was Defective*

Defendant argues that summary judgment is appropriate because Plaintiff cannot raise a triable issue of fact that the Board was defective. For the following reasons, the Court disagrees.

To prevail on a products liability claim, plaintiffs must show that "the product was in some manner defective." June, 1992 WL 168181, at *2. "Regardless of the theory pursued . . . the defective nature of the product is an indispensable element of plaintiffs' prima facie case." Id. (citing Robinson v. Reed-Prentice Div. of Package Mach. Co., 403 N.E.2d 440, 442 (N.Y. 1980)).

Defendant has satisfied its initial burden to show that the Board was not defective by offering the testimony of engineer Eugene Camerota and Defendant's vice president, Chris DeCerbo. See Camerota Report; DeCerbo Dep. Camerota states that the design and manufacturing of the Board followed a "state of the art process" and constituted "good engineering practice," see Camerota Report at 3–4, and DeCerbo testified that he was unaware of any other customer who has had a problem similar to Plaintiff's. DeCerbo Dep. at 109; see also New York Cent. Mut. Fire Ins. Co. v. Electrolux Home Prod., Inc., No. 18-CV-294, 2020 WL 1151460, at *3 (W.D.N.Y. Mar. 9, 2020) (finding that the defendant made a prima facie showing that a product was not defective where a products safety engineer testified that the manufacturing process "represent[ed] the state-of-the-art" and found "no reports of substantially similar incidents").

The burden then shifts to Plaintiff to "demonstrate a triable issue of fact as to whether a defect nevertheless existed." Tedone v. H.J. Heinz Co., 686 F. Supp. 2d 300, 313 (S.D.N.Y.

2009) (citations omitted). Plaintiff has met this burden. Specifically, Rao—Plaintiff's materials expert—concluded that the Board was defective because the gap between the top and bottom layers of the Board exposed the internal fiberglass such that loose fibers could become dislodged and embedded in users' hands during normal use. See Rao Aff. ¶ 30. Rao added that, depending on whether the design intent was to have a gap between the layers, this could be either a design defect or a manufacturing defect. Id.

Rao based his conclusion on the following information and analysis. According to Defendant's marketing materials, the construction of the Board involved "sandwiching" a fiberglass wrap between two plastic layers. Rao Aff. ¶ 13. Visual inspection revealed that there was a gap in the Board seam between the top and bottom layers and that there were exposed fibers in multiple regions. Id. ¶ 17. During the manufacturing process, the technicians used a power router and hand sander to "finish" the Board, which would result in breakage and loosening of the exposed fiberglass in the seam. Id. ¶¶ 27, 29. And because fiberglass fibers are extremely thin and soft, the technicians were unlikely to spot or feel the fibers during their visual and hand inspection. Id. ¶ 28. Upon testing fibers extracted from Plaintiff's hands and the Board seam, Rao concluded that the elemental composition of the two fibers was identical and consistent with that of fiberglass. See Rao Report, Part 2 at 78–79. A reasonable jury could credit Rao's testimony and conclude that the Board was defective.

### 3. *Whether the Board Caused Plaintiff's Injuries*

Defendant also argues that summary judgment is appropriate because Plaintiff has failed to show causation. See Mem. at 18–24. Defendant maintains that Plaintiff cannot show that the Board caused her injuries because (1) there was no fiberglass in Plaintiff's hands and (2) even if there was, her injuries were unrelated to fiberglass. Id.

"[W]hether the action is pleaded in strict products liability, breach of warranty or negligence, it is a consumer's burden to show that a defect in the product was a substantial factor in causing injury." Tardella v. RJR Nabisco, Inc., 576 N.Y.S.2d 965, 966 (3d Dep't 1991); see also In re Mirena IUD Prod. Liab. Litig., 202 F. Supp. 3d 304, 310 (S.D.N.Y. 2016) ("As in any products liability or personal injury action, Plaintiffs must prove causation—that the Defendants' conduct . . . was the proximate cause of Plaintiffs' injuries."), aff'd, 713 F. App'x 11 (2d Cir. 2017). Plaintiff must "show that it is more probable than not that the injury was caused by [a given] defendant." Plemmons v. Steelcase Inc., No. 04-CV-4023, 2007 WL 950137, at *5 (S.D.N.Y. Mar. 29, 2007) (quoting Kennedy v. Peninsula Hosp. Ctr., 522 N.Y.S.2d 671, 674 (2d Dep't 1987)).

### a.   Whether There Was Fiberglass in Plaintiff's Hands

Contrary to what Defendant asserts, the Court finds that Plaintiff has raised a triable issue of fact as to whether there was fiberglass in her hands. Defendant first points out that, during the course of Plaintiff's treatment, no medical provider observed foreign bodies in Plaintiff's hands. See Mem. at 18–19. But Plaintiff testified that she and her sister observed "small translucent whitish fibers" sticking out of her hands, which she removed with tweezers. Pl. Aff. ¶ 23. She collected the removed materials in a jar and presented it to her physician, who documented the materials as "questionable foreign bodies, bilateral hands." SMF ¶ 50; Resp. ¶ 50.

Defendant further notes that Reitman, its materials expert, did not identify fiberglass in Plaintiff's hand samples. However, Plaintiff's materials expert determined that the hand samples contained fibers of the same type as the samples from the Board and that their composition was

very similar to that of fiberglass.[5] See Opp'n at 13; Rao Report, Part 1 at 46. Accordingly, a

reasonable jury could conclude that there was fiberglass in Plaintiff's hands.

b.   Whether Fiberglass Caused Plaintiff's Injuries

Defendant next argues that even if some fiberglass was in Plaintiff's hands, there is no

evidence causally connecting her injuries to fiberglass exposure. Mem. at 21. Here, the Court

agrees, at least with respect to Plaintiff's physical injuries, including pain, ulcerations, and nerve

damage.

The mere existence of foreign objects in a plaintiff's body is not a sufficient basis from

which to infer causation—the plaintiff must also show that those foreign bodies caused her or his

injuries. See e.g., Davila v. Goya Foods, Inc., No. 05-CV-8067, 2007 WL 415147, at *3

(S.D.N.Y. Feb. 7, 2007) (granting summary judgment for distributor defendant where plaintiff

ingested glass while eating a can of octopus but failed to provide any medical evidence linking

the glass to the abdominal pain that he suffered shortly thereafter); Valenti v. Great Atl. & Pac.

Tea Co., 615 N.Y.S.2d 84, 85 (2d Dep't 1994) (granting summary judgment for defendant where

plaintiff did not submit any probative evidence to establish that her flu-like symptoms were

caused by a foreign object in the can of beans she consumed, since "there are many different

---

[5]   Defendant again argues that Rao's conclusion is speculative and "[t]he best he could do
was to conclude that [the fiber from Plaintiff's hand sample] 'appeared to be' fiberglass." Mem.
at 19 (citing Rao Dep. at 86). However, a careful review of the transcript indicates that Rao
meant that the fiber in Plaintiff's hands matched the elemental composition of the fiber from the
Board seam, which "appeared to be" glass fiber. See Rao Dep. at 81–86 ("Essentially the
elements that were noted in the [hand sample] analysis matched the main elements that constitute
[] glass, as well as the diameter and morphology of the glass, [and] of the fiber appeared to be
glass fiber in this case."). In any event, arguments questioning the reliability of expert testimony
solely on the basis of semantics are unavailing, as discussed above. Harris v. Kem Corp., No. 85-
CV-2127, 1989 WL 200446, at *7 (S.D.N.Y. Dec. 2, 1989) ("[T]he probative force of an opinion
is not to be defeated by semantics if it is reasonably apparent that the [expert] intends to signify a
probability supported by some rational basis." (citations omitted)).

causes of nausea, vomiting and stomach distress"). Thus, although Plaintiff has raised a triable

issue of fact as to whether there was fiberglass in her hands, she must do more than that to bridge

the gap between the fiberglass and her physical injuries.

Defendant argues that Plaintiff has failed to bridge that gap, noting that Dr. Ramsay

Farah, an independent medical examiner, opined that Plaintiff's "injuries are not causally related

to the alleged [fiberglass] exposure." See Mem. at 20; Farah Report at 6–8. Dr. Farah based his

opinion on discrepancies between Plaintiff's injuries—specifically with regard to symptoms,

location, and duration—and injuries that would ordinarily result from fiberglass exposure. See

Farah Report at 6–8. Defendant also argues that the only evidence Plaintiff relies on to establish

causation is inadequate, namely the testimony of her two treating physicians, Dr. David Griger

and Dr. John Russin. Mem. at 20. Specifically, Defendant contends that because neither

physician was disclosed as an expert, they may not provide testimony as to the cause of

Plaintiff's injuries beyond the scope of their treatment of Plaintiff, during which neither

identified any foreign bodies in Plaintiff's hands. Id. Moreover, Defendant asserts that the

physicians "merely said it was *possible* that [Plaintiff's] injuries were from fiberglass exposure."

Id. (emphasis in original).

Plaintiff responds that "[a]lthough neither [physician] personally observed any foreign

bodies in [Plaintiff's] hands, they both testified that [her] hand and finger irritation and lesions

were consistent with exposure to fiberglass." Opp'n at 13. Plaintiff does not argue that the

physicians' testimony should be broadly admissible,[6] nor does she adduce any additional

---

[6]   Plaintiff concedes this point by failing to address it in her Opposition. See e.g., Cole v.
Blackwell Fuller Music Publ'g, LLC, No. 16-CV-7014, 2018 WL 4680989, at *7 (S.D.N.Y.
Sept. 28, 2018) ("[A] plaintiff's failure to address an issue in its opposition raised by its
adversary amounts to a concession or waiver of the argument."); In re UBS AG Sec. Litig., No.
07-CV-11225, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) (holding that a party

evidence on causation.[7] See Opp'n at 13. The Court now discusses why the physicians'

testimony has failed to bridge the gap between Plaintiff's injuries and the fiberglass in her hands,

and, thus, is insufficient to defeat summary judgment.

*i.   Dr. Griger's Testimony*

Upon review of the physicians' deposition testimony, the Court finds that the parties'

consensus that the physicians only testified that Plaintiff's injuries were "consistent with" and

"possibl[y]" caused by fiberglass is not accurate with regard to Dr. Griger. See Opp'n at 13;

Mem. at 20; Griger Dep. at 15, 25, 36. Dr. Griger testified that, when he treated Plaintiff, he

came to the conclusion that "a foreign body reaction to the fiberglass fibers that were embedded

in the skin" caused the lesions on Plaintiff's hands. Griger Dep. at 25. He reached this conclusion

by "reviewing [] notes from [Plaintiff's] hand surgeon," "seeing [Plaintiff's] hands," and "getting

her history." Griger Dep. at 25. While such testimony might serve to defeat summary judgment

under other circumstances, it cannot here, because, for the following reasons, Dr. Griger's

testimony is inadmissible. Discover Fin. Servs. v. Visa U.S.A., Inc., 582 F. Supp. 2d 501, 503

(S.D.N.Y. 2008) (citing Daubert, 509 U.S. 579, 589) ("[T]he Supreme Court held that trial courts

have a 'gatekeeping' function to 'ensure that any and all scientific testimony or evidence

admitted is not only relevant, but reliable.'").

---

"concedes through silence" in an opposition brief), aff'd sub nom. City of Pontiac Policemen's &
Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173 (2d Cir. 2014).

[7] Plaintiff does mention in her Opposition that her family members and a physician's
assistant observed fibers in her hands and that her materials expert Rao has identified fiberglass
in the Board seam and in Plaintiff's hands. Opp'n at 13–14. However, such evidence is not
probative on the connection between Plaintiff's injuries and the alleged fiberglass exposure,
given that the Court has already determined that Plaintiff has raised a triable issue of fact as to
whether fiberglass was embedded in Plaintiff's hands.

As an initial matter, the Court notes that Dr. Griger was not designated as an expert witness, nor did Plaintiff provide an expert report or summary for him pursuant to Rule 26(a)(2)(B) or (a)(2)(C). See Docket; Fed. R. Civ. P. 26(a)(2)(B)–(C). It is well established that "[t]reating physicians do not need to be designated as experts in order to testify." Reilly v. Revlon, Inc., No. 08-CV-205, 2009 WL 2900252, at *3 (S.D.N.Y. Sept. 9, 2009). But "without properly declaring a treating physician as an expert witness, the physician's testimony is limited to . . . his/her care and treatment of the patient." Spencer v. Int'l Shoppes, Inc., No. 06-CV-2637, 2011 WL 4383046, at *2 (E.D.N.Y. Sept. 20, 2011). Since Dr. Griger's conclusion relies on the notes of a hand surgeon and is "not gleaned from his own diagnoses and treatment of the Plaintiff," see Griger Dep. at 15, 25, 36, he cannot testify to causation without being declared an expert witness and having prepared the necessary report or summary. See Spencer, 2011 WL 4383046, at *4.

However, even to the extent that Dr. Griger's causation opinion relies on his observations of Plaintiff's hands and her history, that opinion must be excluded as unreliable. "[W]hen the treating physician seeks to render an opinion on causation, that opinion is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for the purposes of litigation." Davids v. Novartis Pharm. Corp., 857 F. Supp. 2d 267, 280 (E.D.N.Y. 2012) (internal quotations marks omitted). Federal Rule of Evidence 702 requires that expert testimony be based on sufficient facts or data, be the product of reliable principles and methods, and result from the witness' reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702. The district court has "broad latitude" as to how it determines reliability and whether the expert's testimony is admissible. Kumho Tire Co., 526 U.S. at 152.

As noted above, Dr. Griger "review[ed] the notes from the plastic surgeon, talk[ed] with [Plaintiff], and [observed] the lesions on her hands," though he did not personally observe any foreign bodies in Plaintiff's hands. Griger Dep. at 36. Based on this evidence, Dr. Griger concluded that foreign bodies caused an "inflammatory reaction" in Plaintiff's hands. See id. at 15, 25, 36. But such testimony is unreliable for three reasons. First, Dr. Griger's conclusion is not based on sufficient facts or data. See Fed. R. Evid. 702. He could not recall what the surgeon's notes said and was not sure if the surgeon had concluded there were foreign bodies in Plaintiff's hands or if the surgeon had performed a biopsy. Griger Dep. at 16, 26. The Court is unable to verify whether the notes corroborated his opinion. See Robinson v. Suffolk Cty. Police Dep't, No. 08-CV-1874, 2011 WL 4916709, at *3 (E.D.N.Y. Oct. 17, 2011) (excluding expert testimony because there was no "delineation as to what specifically from the limited records identified here led to this opinion"), aff'd, 544 F. App'x 29 (2d Cir. 2013); cf. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 145 (1997) (excluding expert testimony where the court found that the four studies the expert relied on did not support his conclusion and were not a sufficient basis for his opinion). Second, Dr. Griger failed to explain the reasoning or methodology by which he reached his conclusion. See generally Griger Dep. When asked whether "there [was] something about the lesions themselves that made [him] . . . believe the[y] were caused by foreign bodies," Dr. Griger answered affirmatively but merely repeated without any elaboration that he came to this conclusion because "[t]he story fit, the history, findings fit." Id. at 36. Such testimony fails to demonstrate the "sufficiently rigorous analytical connection between [the] methodology and the [] conclusions" as required by Rule 702. Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005); LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 647 (S.D.N.Y. 2016) ("There is [] no basis on which to hold that [the expert's] opinions derive from

a reliable methodology" where the expert identified the basis of his conclusions but "offered no non-conclusory, or remotely clear, explication as to how any of those factors bore on his analysis"), aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA, 720 F. App'x 24 (2d Cir. 2017). Third, Dr. Griger adopted Plaintiff's narrative without attempting to rule out other possible causes, further undermining the reliability of his opinion.[8] See e.g., Gilks v. Olay Co., 30 F. Supp. 2d 438, 444 (S.D.N.Y. 1998) (excluding expert opinion that plaintiff's skin irritation was caused by her use of Oil of Olay because it "was not based on anything other than plaintiff informing [the expert] that she had recently begun using the Product").

Considering the insufficient basis for the testimony and the thin reasoning and methodology, the Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co., 522 U.S. at 146. Accordingly, the Court excludes Dr. Griger's testimony on causation as unreliable. And, therefore, Dr. Griger's testimony cannot raise a triable issue of fact as to causation, nor defeat Defendant's summary judgment motion.

### ii. Dr. Russin's Testimony

Dr. Russin's testimony, if admitted, is also insufficient to defeat summary judgment. He testified that "the history [Plaintiff] provided could be very consistent with fiberglass irritation in the hand," but he could not "conclude specifically what could have been [the cause of her hand

---

[8] Defendant has raised two potential alternative causes of Plaintiff's injuries. First, Dr. Farah opined that "the injuries suffered by [Plaintiff] were not caused by fiberglass, but were rather factitial in nature." Farah Report at 6. "Factitial dermatitis [] is a condition in which skin lesions are solely produced or inflicted by the patient's own actions." Id. Second, before Plaintiff relayed her suspicions that the Board was the source of the things under her skin, a healthcare worker opined that Plaintiff might have broken glass embedded in her hands. Pl. Aff. ¶ 20. Plaintiff admitted that "it may be possible as, with four children, things occasionally would be broken." Id. But Dr. Griger made no effort to rule out alternative explanations such as these.

complaints].” Russin Dep. at 44. He further explained that Plaintiff's injuries might have

stemmed from other causes. See e.g., id. at 22, 40 (“[The inflammation] could certainly [mean

something] other than a foreign body . . . . Just because people have numb fingers, you can't

blame one thing. There could be other reasons. We see people every day with numb fingers who

have never had contact with fiberglass.”). Nowhere in his testimony did Dr. Russin conclude, to

a reasonable degree of medical certainty, that fiberglass caused Plaintiff's injuries. See generally

Russin Dep. Therefore, his testimony does not raise a triable issue of fact as to causation. See

e.g., In re Gen. Motors LLC Ignition Switch Litig., No. 14-CV-5810, 2017 WL 6729295, at *8

(S.D.N.Y. Dec. 28, 2017) (holding that “mere possibility is not proof of causation” where the

witnesses' analyses established that plaintiffs' theory was consistent with the facts but did not

establish that plaintiffs' theory “was the likeliest scenario—let alone that it actually occurred”);

Beyer v. Anchor Insulation Co., 238 F. Supp. 3d 270, 284 (D. Conn. 2017) (holding that expert

testimony establishing “a likely association of exposure to symptoms” did not “provide a

reasonable jury with an evidentiary basis for concluding plaintiffs had proved the requisite

element of proximate cause”).

### c.  Conclusion

As noted, the only evidence Plaintiff offers to prove that her injuries were caused by

fiberglass, other than the mere existence of it in her hands, is the testimony of the two physicians.

And since Dr. Griger's testimony is excluded as unreliable and Dr. Russin's is insufficient to

raise a triable issue of fact, Plaintiff has failed to present evidence from which a reasonable jury

could conclude that fiberglass caused the injuries to her hands. Accordingly, summary judgment

is warranted because Plaintiff has failed to raise a genuine issue of material fact concerning a

critical element in this case. See e.g., Davila, 2007 WL 415147, at *3 (granting summary

judgment for defendant because "[i]n the absence of medical evidence showing [causation], plaintiff cannot save his claim via his own speculative conclusion that his stomach disorder resulted from the consumption of glass"); Gilks, 30 F. Supp. 2d at 446 (granting summary judgment for defendant where plaintiff "has presented no concrete proof, medical or otherwise, to raise a genuine issue of fact for trial" regarding whether her injuries were caused by her use of Oil of Olay).

However, the Court notes that in her Complaint, in addition to pain, nerve damage, scarring, and other physical injuries, Plaintiff also alleges that she has suffered depression. Compl. ¶ 17. And in her response to Defendant's interrogatories, Plaintiff confirms that she "suffered psychological and emotional injury." Interrog. at 2. Since Defendant's Summary Judgment Motion is entirely silent on Plaintiff's emotional injuries, the Court cannot dispose of Plaintiff's claim in its entirety. See Davila, 2007 WL 415147, at *3 (declining to grant summary judgment in its entirety where defendant did not address plaintiff's claim that she suffered emotional injuries after ingesting glass). Because Plaintiff's claim for emotional injury survives, the Court turns to Defendant's other arguments.

### 4. Other Issues Raised by Defendant

#### a.  Design Defect

Defendant argues that Plaintiff cannot prevail under a defective design theory sounding in either strict liability or negligence because she has provided no evidence that a safer design was feasible. Mem. 14–15, 22–23. Under New York law, claims premised on design defect sounding in either strict liability or negligence are "functionally equivalent." O'Neil v. Argon Med. Devices, Inc., No. 17-CV-640, 2020 WL 1149904, at *4 (N.D.N.Y. Feb. 13, 2020) (citations omitted), report and recommendation adopted by No. 17-CV-640, 2020 WL 1140511 (N.D.N.Y.

Mar. 9, 2020). To establish a prima facie case of design defect under New York law, "plaintiffs must establish that (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing her injury." Argonaut Ins. Co. v. Samsung Heavy Indus. Co., 929 F. Supp. 2d 159, 171–72 (N.D.N.Y. 2013) (citing Voss, 450 N.E.2d 204, 208–09). After reviewing Plaintiff's opposition papers and Rao's report, the Court agrees with Defendant that Plaintiff did not submit any evidence of an alternative design. Therefore, the Court grants summary judgment as to Plaintiff's design defect claims, whether sounding in strict liability or negligence.

b.  Failure to Warn

Defendant argues that Plaintiff cannot prevail on her failure to warn claim because Defendant was not aware of any danger from fiberglass posed by the product. Mem. at 15. Under New York law, to prevail on a claim for failure to warn, a plaintiff must demonstrate that "(1) a manufacturer has a duty to warn (2) against dangers resulting from foreseeable uses about which it knew or should have known, and (3) that failure to do so was the proximate cause of the harm." Rosen v. St. Jude Med., Inc., 41 F. Supp. 3d 170, 183 (N.D.N.Y. 2014) (Kahn, J.) (citing State Farm Fire & Cas. Co. v. Nutone, Inc., 426 F. App'x 8, 10 (2d Cir. 2011)). Defendant cites its vice president's testimony that no other customers, besides Plaintiff, have complained to Defendant of fiberglass exposure from this product. Mem. at 11; DeCerbo Dep. at 98–102. Plaintiff, for her part, does not argue that Defendant did know or should have known the potential danger from fiberglass exposure. See Opp'n at 17. Accordingly, the Court grants summary judgment as to Plaintiff's failure to warn claim.

c.   Breach of Express Warranty

Defendant argues that Plaintiff cannot prevail under breach of express warranty because "even if she was aware of any warranty, [she] did not rely on it in making her purchase. Mem. at 16. "New York breach of express warranty claims require (i) a *material statement* amounting to a warranty; (ii) the buyer's *reliance* on this warranty as a basis for the contract with his immediate seller; (iii) the *breach* of this warranty; and (iv) injury to the buyer *caused* by the breach." Avola v. Louisiana-Pac. Corp., 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013) (emphasis in original) (citations omitted). Plaintiff cites Defendant's statement of warranty but provides no evidence that Plaintiff relied on that statement when purchasing the Board. See Opp'n at 17. Thus, the Court grants summary judgment as to Plaintiff's breach of express warranty claim.

d.   Punitive Damages

Defendant argues that Plaintiff is not entitled to punitive damages because there is no evidence that Defendant did anything intentional or outrageous that would warrant punitive damages.[9] Mem. at 17. Because Plaintiff makes no mention of punitive damages in her Opposition, the Court finds that Plaintiff has abandoned this claim and grants summary judgment for Defendant. See Dark Storm Indus. LLC v. Cuomo, No. 20-CV-360, 2020 WL 3833107, at *15 (N.D.N.Y. July 8, 2020) (Kahn, J.) ("Because Plaintiffs make no response to these portions of Defendants' Motion . . . the Court finds that Plaintiffs have abandoned these claims."); Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, 143 (2d Cir. 2016) ("[A] partial response [by the non-movant] arguing that summary judgment should be denied as to some

---

[9]   Defendant also argues that because the underlying causes of action are dismissed, the claim for punitive damages must likewise be dismissed. Mem. at 17. Since the Court does not dismiss all of Plaintiff's causes of action, this argument is unavailing.

claims while not mentioning others may be deemed an abandonment of the unmentioned claims.") (alterations in original).

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Summary Judgment Motion (Dkt. No. 53) is **GRANTED in part** and the following causes of action are **DISMISSED in their entirety**: strict products liability – design defect; strict products liability – failure to warn; negligent design; breach of express warranty; and punitive damages; and it is further

**ORDERED**, that the following causes of action are **DISMISSED in part** as to Plaintiff's physical injuries but may proceed as to her emotional or psychological injuries: strict products liability – manufacturing defect; negligent manufacture; general negligence; and breach of implied warranty; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      August 05, 2020
            Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge